YOUNG, J.
The sole question presented in this case is whether plaintiffs have standing to bring a claim under *285 the Michigan Environmental Protection Act (MEPA)[1] as that claim relates to certain streams, lakes, and wetlands in Mecosta County.
In Nat’l Wildlife Federation v Cleveland Cliffs Iron Co,[2] we noted that “ ‘environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons “for whom the aesthetic and recreational values of the area will be lessened” by the challenged activity.’ ”[3] Plaintiffs indisputably have standing to bring a MEPA claim against Nestlé to protect their riparian property rights to Thompson Lake and the Dead' Stream. However, plaintiffs have failed to demonstrate that they use the Osprey Lake Impoundment (Osprey Lake) and Wetlands 112, 115, and 301, and that, as a result, their recreational, aesthetic, or other interests have been impaired. Accordingly, pursuant to MCR 7.302(G)(1), in lieu of granting leave to appeal, we affirm the Court of Appeals in part, but we reverse the Court of Appeals holding that plaintiffs have standing to bring a MEPA claim regarding Osprey Lake and Wetlands 112, 115, and 301, and remand this case to the circuit court for further proceedings consistent with this opinion.
I. FACTS AND PROCEDURAL HISTORY
This highly publicized case concerns certain interconnected .streams, lakes, and wetlands north of the Tri-Lakes region in Mecosta County, Michigan. These bodies of water include Osprey Lake, Thompson Lake, *286 the Dead Stream, and several wetlands that, for purposes of this case, have been enumerated Wetlands 112, 115, and 301. Osprey Lake is a man-made lake created by the damming and flooding of the Dead Stream. An earthen dam on the east end of Osprey Lake separates Osprey Lake and the Dead Stream. The Dead Stream flows southeast where it eventually joins the TriLakes.[4] Just south of Osprey Lake is a small natural lake, Thompson Lake. To the west and north of Osprey Lake are Wetlands 112, 115, and 301.
Defendants Donald and Nancy Bollman own approximately 850 acres of land in an area known as the Sanctuary that surrounds Osprey Lake and several of the enumerated wetlands.[5] The Bollmans have operated the Sanctuary as a private hunting preserve since they acquired the property in the 1970s. They granted Nestlé the groundwater rights to a 139-acre area on the northern shore of Osprey Lake within the Sanctuary after preliminary tests indicated that the land contained a suitable and reliable source of spring water.[6]
In order to begin pumping and bottling the water, Nestlé also obtained permits from the Michigan Department of Environment Quality (MDEQ) that ensured its compliance with the standards of the Safe Drinking Water Act.[7] In August 2001, the MDEQ issued Nestlé a permit *287 to convert two test wells to production wells and to install water mains, pump stations, and booster stations to transport the spring water to Nestlé’s soon-to-be-constructed bottling facility in Stanwood, Michigan. In February 2002, the MDEQ issued another permit, authorizing two additional production wells at the Sanctuary Springs site. The MDEQ permits authorized Nestlé to operate the four wells at a combined maximum pumping rate of 400 gallons per minute. Armed with the required permits, Nestlé commenced pumping operations in 2002.
Plaintiff Michigan Citizens for Water Conservation (MCWC) is a non-profit corporation of approximately 1,300 members that formed to protect and conserve water resources in Michigan, particularly in Mecosta County. It views Nestlé and its pumping activities as inimical to MCWC’s mission. Two hundred sixty-five members are riparian owners in the Tri-Lakes area, including plaintiffs R.J. and Barbara Doyle, who own land on the Dead Stream, and plaintiffs Jeffrey and Shelly Sapp, who own land on Thompson Lake.
MCWC filed suit in June 2001, seeking temporary and permanent injunctive relief against Nestlé. The trial court denied plaintiffs’ request for temporary injunctive relief to prevent Nestlé’s construction of the Stanwood bottling facility while the parties litigated Nestlé’s right to pump spring water from Sanctuary Springs. Later, in November 2001, plaintiffs filed a six-count second amended complaint.[8] Following *288 Nestlé’s and plaintiffs’ cross-motions for summary disposition, the trial court dismissed all the counts except the common-law groundwater claim and the MEPA claim, which proceeded to trial.
After a lengthy bench trial, the trial court granted plaintiffs’ request for a permanent injunction of Nestlé’s pumping activities. In its opinion, the court made elaborate findings of fact identifying what it called the “zone of influence,” the “hydrological effects,” and the “ecological impacts” of Nestlé’s pumping activities.[9] Relying on these factual findings, the court ruled that plaintiffs prevailed on both the common-law groundwater claim and the MEPA claim and that the only appropriate remedy was to grant a permanent injunction.[10]
*289 Both plaintiffs and Nestlé appealed and, in a published opinion, the Court of Appeals affirmed in part, reversed in part, and remanded to the trial court.[11] Appealing the MEPA claim, Nestlé argued that plaintiffs lacked standing to bring that claim with respect to Osprey Lake and Wetlands 112, 115, and 301.[12] Judges White and Murphy, forming the majority on the standing question, disagreed with Nestlé. Holding that plaintiffs had standing “with respect to all the natural resources at issue,” Judge MURPHY wrote that
plaintiffs have standing because of the complex, reciprocal nature of the ecosystem that encompasses the pertinent natural resources noted above and because of the hydrologic interaction, connection, or interrelationship between these natural resources, the springs, the aquifer, and defendant Nestlé’s pumping activities, whereby impact on one particular resource caused by Nestlé’s pumping necessarily affects other resources in the surrounding area. Therefore, although there was no evidence that plaintiffs actually used or physically participated in activities on the Osprey Lake impound *290 ment and wetlands 112,115, and 301, environmental injuries to those natural resources play a role in any harm caused to the Dead Stream, the Dead Stream’s wetlands, and Thompson Lake, which are used by and adjacent to properly owned by plaintiffs and not the subject of a standing challenge.[13]
Judge SMOLENSK! dissented. He would have found that plaintiffs lacked standing with respect to Osprey Lake and Wetlands 112,115, and 301 because plaintiffs did not use those areas, so they could not demonstrate that they had suffered or would suffer a concrete or particularized injury distinct from that of the public generally.[14] Judge SMOLENSKI also would have declared unconstitutional MCL 324.1701(1),[15] which authorizes “any person” to bring a MEPA claim.[16] He considered that provision an unlawful attempt by the Legislature to confer standing broader than the constitutional limits set forth in Lee v Macomb Co Bd of Comm’rs,[17] and Nat’l Wildlife.[18]
*291 Both parties sought leave to appeal in this Court. We ordered oral argument on the applications, directing the parties to address only “whether the plaintiffs have standing under Nat’l Wildlife Federation v Cleveland Cliffs Iron Co, 471 Mich 608 (2004), to bring claims related to the Osprey Lake impoundment and wetlands 112, 115, and 301.”[19] Hence, we limit our decision to the issue of standing. We do not pass on the merits of the other issues raised on appeal.
II. STANDARD OP REVIEW
Whether a party has standing is a question of law that we review de novo.[20]
III. ANALYSIS
A. STANDING
This Court recently explained in Michigan Chiropractic Council v Comm’r of the Office of Financial & Ins Services,[21] that
[o]ur tripartite system of government is constitutionally established in both our state and federal constitutions. US Const, art III, § 1 confers upon the courts only “judicial power”; US Const, art III, § 2 limits the judicial power to “[clases and [clontroversies.” Similarly, our state constitution, Const 1963, art 3, § 2, provides:
“The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers *292 properly belonging to smother branch except as expressly provided in this constitution.”
The powers of each branch are outlined in the Michigan Constitution, which assigns to the Legislature the task of exercising the “legislative power,” the Governor the task of exercising the “executive power,” and the judiciary the task of exercising the “judicial power.”[22]
Standing is an indispensable doctrine rooted in our constitution and the tripartite system of government it prescribes. We vigilantly enforce principles of standing in order to vindicate the separation of legislative, executive, and judicial powers among the coordinate branches of government to which those respective powers have been committed. Indeed, “neglect of [standing] would imperil the constitutional architecture” carefully constructed by its drafters and ratified by the people.[23] To neglect standing would empty the phrases “executive power,” “legislative power,” and “judicial power” of their intended significance and render the separation of powers demanded by Const 1963, art 3, § 2 meaningless. The purposely drawn boundaries within our tripartite government would vanish, removing the impediments that were intended to prevent one branch of government from exercising powers exclusively vested in the other, coequal branches.
As part of this endeavor to preserve separation of powers, the judiciary must confine itself to the exercise of the “judicial power” and the “judicial power” alone. *293 “Judicial power” is an undefined phrase in our constitution, but we noted in Nat’l Wildlife that
[t]he “judicial power” has traditionally been defined by a combination of considerations: the existence of a real dispute, or case or controversy; the avoidance of deciding hypothetical questions; the plaintiff who has suffered real harm; the existence of genuinely adverse parties; the sufficient ripeness or maturity of a case; the eschewing of cases that are moot at any stage of their litigation; the ability to issue proper forms of effective relief to a party; the avoidance of political questions or other non-justiciable controversies; the avoidance of unnecessary constitutional issues; and the emphasis upon proscriptive as opposed to prescriptive decision making. [471 Mich at 614-615.]
We went on in Nat’l Wildlife to distill this litany of considerations arising from the proper exercise of the “judicial power,” and we determined that “the most critical element” is “its requirement of a genuine case or controversy between the parties, one in which there is a real, not a hypothetical, dispute.”[24]
Steadfast enforcement of standing principles and separation of powers demands remarkable judicial self-restraint. Before his appointment to the United States Supreme Court, Chief Justice John Roberts wrote that the doctrine of standing “implement[s] the Framers’ concept of ‘the proper — and properly limited — role of the courts in a democratic society’ ” so that “[standing is thus properly regarded as a doctrine of judicial self-restraint.”[25] He noted that “[separation of powers is a zero-sum game” and the doctrine of standing *294 “ensures that the court is carrying out its function of deciding a case or controversy,” and not fulfilling the responsibilities of the other branches.[26] More recently, writing for the Court in DaimlerChrysler v Cuno,[27] Chief Justice Roberts argued that a court has “no business” deciding a dispute that is not a proper case or controversy and quoted Chief Justice John Marshall’s observation that
“[i]f the judicial power extended to every question under the constitution it would involve almost every subject proper for legislative discussion and decision; if to every question under the laws and treaties of the United States it would involve almost every subject on which the executive could act. The division of power [among the branches of government] could exist no longer, and the other departments would be swallowed up by the judiciary.”
Thus, the court that earnestly adheres to the doctrine of standing must exercise self-discipline to resist the temptation of usurping power from the other branches. The court that is willing to compromise the doctrine of standing and reach beyond the “judicial power” lacks such discipline.
Standing ensures that a genuine case or controversy is before the court. It “ ‘requires a demonstration that the plaintiffs substantial interest will be detrimentally affected in a manner different from the citizenry at large.’ ”[28] To successfully allege standing, a plaintiff must prove three elements.
“First, the plaintiff must have suffered an ‘injury in facf-an invasion of a legally protected interest which is (a) *295 concrete and particularized, and (b) ‘actual or imminent, not “conjectural” or “hypothetical.”’ Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be ‘fairly .. . traceable to the challenged action of the defendant, and not... the result [of] the independent action of some third party not before the court.’ Third, it must be ‘likely,’ as opposed to merely ‘speculative,’ that the injury will be ‘redressed by a favorable decision.’ ” [Nat’l Wildlife, 471 Mich at 628-629, quoting Lee, 464 Mich at 739, quoting Lujan v Defenders of Wildlife, 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d 351 (1992).][29]
Where the plaintiff claims an injury related to the environment, this Court lacks the “judicial power” to hear the claim if the plaintiff cannot aver facts that he has suffered or will imminently suffer a concrete and particularized injury in fact. In this context, “ ‘environ *296 mental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons “for whom the aesthetic and recreational values of the area will he lessened” by the challenged activity.’ ”[30] An injury in fact is established when the defendant’s activities directly affected the plaintiffs recreational, aesthetic, or economic interests.[31]
B. APPLICATION
Plaintiffs MCWC and the Doyles and Sapps must satisfy the three elements of standing to pursue a MEPA claim against Nestlé. In other words, they must have (1) suffered an injury in fact (2) causally connected to Nestlé’s conduct that (3) can be redressed by a favorable decision. MCWC, as a nonprofit organization, must satisfy our requirement for organizational standing. A nonprofit organization has standing to bring suit in the interest of its members if its members would have standing as individual plaintiffs.[32]
Defendant concedes, and we agree, that plaintiffs have standing to bring a MEPA claim with respect to the Dead Stream and Thompson Lake, because the Doyles and the Sapps enjoy riparian property rights to the Dead Stream and Thompson Lake, respectively. Therefore, if Nestlé’s pumping activities have impaired their riparian property rights, they clearly have suffered an injury in fact. Moreover, because these individual plaintiffs are members of MCWC, they confer organizational standing on MCWC with respect to the Dead Stream and Thompson Lake.
*297 However, turning to Osprey Lake and Wetlands 112, 115, and 301, the record below does not indicate that plaintiffs used or had access to these areas or that they enjoyed a recreational, aesthetic, or economic interest in them. Plaintiffs failed to establish that they have a substantial interest in these areas, detrimentally affected by Nestlé’s conduct, that is distinct from the interest of the general public. The absence of a concrete, particularized injury in fact is fatal to plaintiffs’ standing to bring a MEPA claim with respect to Osprey Lake and Wetlands 112, 115, and 301.
To be clear, we are refining, not dismissing, plaintiffs’ MEPA claim. Plaintiffs enjoy the full protection that MEPA affords to vindicate their riparian property interests. Thus, they have standing insofar as Nestlé’s pumping activities inflicted an injury in fact with respect to the Dead Stream and Thompson Lake. However, plaintiffs cannot similarly establish standing with respect to Osprey Lake and Wetlands 112, 115 and 301.[33]
In reaching this conclusion, we reject the Court of Appeals “interconnectedness” theory of standing as inconsistent with Lee and Nat’l Wildlife. The trial court found as fact that many of the streams, lakes and wetlands in the Tri-Lakes area are joined by an inextricable, hydrological link. Drawing from these facts, the Court of Appeals held that
plaintiffs have standing because of the complex, reciprocal nature of the ecosystem that encompasses the pertinent natural resources noted above and because of the hydro- *298 logic interaction, connection, or interrelationship between these natural resources, the springs, the aquifer, and defendant Nestlé’s pumping activities, whereby impact on one particular resource caused by Nestlé’s pumping necessarily affects other resources in the surrounding area. Therefore, although there was no evidence that plaintiffs actually used or physically participated in activities on the Osprey Lake impoundment and wetlands 112, 115, and 301, environmental injuries to those natural resources play a role in any harm caused to the Dead Stream, the Dead Stream’s wetlands, and Thompson Lake, which are used by and adjacent to property owned by plaintiffs and not the subject of a standing challenge. [.Michigan Citizens, 269 Mich App at 113 (emphasis added).]
The flaw in this “interconnectedness” theory of standing is that it permits plaintiffs to evade their burden to establish an injury in fact. As the United States Supreme Court stated in Friends of the Earth, Inc v Laidlaw Environmental Services (TOC),[34] the relevant inquiry in standing analysis is not whether the environment suffered injury, but whether the plaintiff suffered injury. If the hydrological links are as the trial court found, then a reduced flow or water level at one point in the interconnected hydrological system will have a measurable effect elsewhere in that system. But plaintiffs must still establish how they have suffered a concrete and particularized injury in fact within this interrelated ecosystem. The environmental peculiarities of the Tri-Lakes area, or any ecosystem for that matter, do not obviate constitutional standing requirements.
Plaintiffs defend the Court of Appeals standing analysis by arguing that all of the harm in this case is singularly traceable to Nestlé’s pumping activity, and so their single MEPA claim cannot be divided into multiple *299 causes of action. They emphasize that they have raised one MEPA claim to address the multitude of harms allegedly caused by Nestlé’s pumping activities and seek one, indivisible remedy: to halt Nestlé’s withdrawals. According to plaintiffs, an entire ecosystem that includes Osprey Lake and Wetlands 112, 115, and 301 has been harmed.
Plaintiffs’ argument misses the basic point that plaintiffs are the focus of the standing inquiry, not the TriLakes region. We reject plaintiffs’ bootstrapping approach to standing under which, as long as they have standing to redress their injury in fact, they have standing to redress all injuries conceivably related to their injury in fact. No matter how pervasive the environmental damage in an ecosystem, plaintiffs must still successfully and succinctly establish their injury in fact. Plaintiffs satisfy this requirement for the Dead Stream and Thompson Lake, but not Osprey Lake and Wetlands 112, 115, and 301.
The caselaw that plaintiffs cite to support their position actually confirms our analysis. The Supreme Court cases cited by plaintiffs consistently required that the plaintiff demonstrate an injury in fact in order to bring suit.[35] Indeed, in Lujan v Defenders of Wildlife,[36] the Court discredited an “ecosystem nexus” approach to standing that would grant standing to “any person who uses any part of a ‘contiguous ecosystem’ adversely affected ... even if the activity is located a great distance away.” The Court also held that “a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly ‘in *300 the vicinity’ of it.”[37] Yet, in this case, the Court of Appeals endorsed and plaintiffs advocate precisely the “ecosystem nexus” approach that the United States Supreme Court rejected in Lujan. All the water on the planet is connected in some way through the hydrological cycle. Were the “ecosystem nexus” approach consistent with the operant doctrine of standing, it would justify the standing of anyone but a Martian to contest water withdrawals occurring in Michigan. Traditional standing principles would be obliterated.
Plaintiffs also rely on Cantrell v City of Long Beach.[38] In Cantrell, the plaintiff birdwatchers brought several claims against the defendants arising from the defendants’ plan to demolish a naval station. The gist of the birdwatchers’ complaint was that this demolition would also destroy bird habitats on the site. The Ninth Circuit Court of Appeals reversed the district court’s decision that the birdwatchers lacked standing to pursue a National Environmental Policy Act (NEPA) claim, holding that the birdwatchers sufficiently alleged an injury in fact because the defendants’ actions impaired the birdwatchers’ recreational and aesthetic interest in viewing these bird habitats. The Ninth Circuit did not decide whether the birdwatchers had a legal right to enter the naval station because “their desire to view the birds at the Naval Station from publicly accessible locations outside the station is an interest sufficient to confer standing.”[39] Plaintiffs argue that, under Cantrell, they need not own Osprey Lake or Wetlands 112, 115, or 301, or possess a right to access them, to establish an injury in fact if those properties suffer environmental damage.
*301 In Nat’l Wildlife, we held that affidavits from individuals alleging that their activities of birdwatching, canoeing, biking, hiking, skiing, fishing, and farming would be impaired by the defendant’s activities were sufficient to meet the standing test articulated in Lee.[40] Therefore, without endorsing Cantrell but accepting arguendo that impairment of aesthetic and recreational interests such as birdwatching can satisfy constitutional standing, we note that plaintiffs’ claim would fail even under Cantrell. In Cantrell, the birdwatchers did allege an injury in fact — their recreational and aesthetic interests in bird watching were impaired. In this case, plaintiffs have not similarly alleged an impairment of an aesthetic or recreational interest in Osprey Lake and Wetlands 112, 115, and 301.
Plaintiffs and their supporting amici[41] claim that two unique and related considerations render traditional standing analysis inappropriate in this case. First, they argue that Const 1963, art 4, § 52 establishes the public interest in the protection of Michigan’s natural resources and that Const 1963, art 4, § 52 directs the Legislature to enact appropriate legislation to protect these natural resources.[42] Second, plaintiffs and amici argue that the Legislature carried out this constitutional directive by enacting MEPA, in which the Legis *302 lature created a legally cognizable right to clean air, water, and other natural resources that “any person” can vindicate if that right is invaded.[43]
We disagree that either of these considerations changes the standing inquiry. Simply put, neither Const 1963, art 4, § 52 nor MCL 324.1701(1) lightens a plaintiff’s burden to satisfy traditional standing requirements in environmental cases. In Nat’l Wildlife, we noted that “art 4, § 52 does not authorize the Legislature to ignore all other provisions of the constitution in enacting laws to protect the environment.”[44] The elements of individual and organizational standing must be met in environmental cases as in every other lawsuit, unless the constitution provides otherwise.[45] Nothing in the language of this provision indicates that the paramount public concern for the conservation and development of Michigan’s natural resources and the Legislature’s responsibility to protect these resources compromises the principles of standing and renders them inapplicable to environmental plaintiffs.
Similarly, simply by enacting MCL 324.1701(1), the Legislature cannot compel this Court to exercise the “judicial power” beyond constitutional limits any more than this Court can legitimately enlarge or diminish the Legislature’s constitutionally prescribed “legislative power.”[46] We agree with plaintiffs and amici that the *303 Legislature holds the power to create statutory causes of action. However, the exercise of this power must still respect separation of powers.[47] Moreover, plaintiffs’ belief that MEPA authorizes citizen suits does not change the calculus. As we outlined in Nat’l Wildlife and more recently in Rohde, citizen suits historically have conferred on the litigant a concrete private interest in the outcome of the suit, and therefore involved only those who have suffered either a direct or assigned injury in fact.[48] Plaintiffs have not established their concrete interest in Osprey Lake and Wetlands 112, 115, and 301.
IV RESPONSE TO JUSTICE KELLY
Justice Kelly quotes the United States Supreme Court’s statement from Warth that “ ‘so long as the [standing] requirement is satisfied, persons to whom [the Legislature] has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim.’ ”[49] She reasons by analogy from this statement that because plaintiffs have standing with respect to the Dead Stream and Thompson Lake, they can assert the interests of the *304 general public and challenge the total effects of defendant’s pumping, including any effects on Osprey Lake and Wetlands 112, 115, and 301.
We conclude that Justice Kelly’s reliance on that statement from Warth is misplaced. First, the above-quoted statement from Warth is taken out of context by Justice KELLY. Warth simply does not stand for the proposition that a plaintiff may bring a claim asserting the general public interest where the plaintiff lacks constitutional standing to bring that claim himself.[50] Warth plainly stated that plaintiffs “may invoke the general public interest in support of their claim,” not that plaintiffs could bring a claim under the banner of the public interest even though they lacked standing to raise that claim.[51] Had the Warth Court held to the contrary, it would have created a glaring, untenable exception to Article Ill’s case or controversy requirement inconsistent with its own decision. Such a holding also would have flatly conflicted with Sierra Club v Morton ,[52] where the Court held that the plaintiffs lacked standing to challenge the commercial development of a national forest because the plaintiffs failed to allege how the development would injure the Sierra Club or its members. Thus, the plaintiffs could not bring suit as a “representative of the public” where they lacked individual standing.
*305 The above-quoted statement from Warth was also dictum. In the sentence immediately preceding that statement, the Court emphasized that even where Congress lowered the prudential bar to standing for a plaintiff, the minimum Article III requirements remain and the plaintiff “still must allege a distinct and palpable injury to himself.”[53] It was in the context of this discussion that the Court ultimately held that none of the plaintiffs had standing to sue because none of the plaintiffs met the threshold standing requirements to bring suit against the defendants. Thus, its brief statement about the role of the “general public interest” in standing analysis was not essential to its decision.
In this case, plaintiffs cannot allege an injury in fact with respect to Osprey Lake and Wetlands 112,115, and 301. It follows that they cannot bring a MEPA claim with respect to those particular bodies of water because they cannot satisfy the minimum threshold for standing. Thus, we fail to see how plaintiffs could invoke the general public interest “in support of” a MEPA claim that they could never bring with respect to Osprey Lake and Wetlands 112, 115, and 301. Some of the confusion in this case might stem from the fact that the alleged widespread environmental damage affecting the several bodies of water was reputedly traceable to Nestlé’s pumping activities. Thus, if true, as a practical matter, injunctive relief ordering Nestlé to reduce or to stop its pumping activities could benefit Osprey Lake and Wetlands 112, 115, and 301. Nevertheless, we cannot confuse the potential effect of the remedy with plaintiffs’ constitutional burden to prove that they have standing to bring a claim.
We have not, as Justice KELLY insists, selectively adopted favorable portions of federal standing law and *306 ignored others. Rather, we have parsed the language from Warth carefully and given attention to its proper context. It is Justice KELLY who, by contrast, selectively relied on dictum in Warth. Although Justice KELLY elevates this dictum to a foundational principle of federal standing jurisprudence,[54] we, for the aforementioned reasons, repudiate her conclusion.[55]
*307 V RESPONSE TO JUSTICE WEAVER
Justice Weaver’s dissent merely reiterates objections she lodged in response to our prior standing cases— objections that this Court has considered and rejected. Because there is little to add to our previous colloquies with the dissenter (other than to direct the reader to our analyses in Lee and Nat’l Wildlife), we will briefly respond.
Justice WEAVER persists in her argument that the textual differences between the federal constitution and our state constitution prove that the exercise of “judicial power” or the doctrine of separation of powers in our constitution means something radically different than it does under the federal constitution.[56] This argument that separation of powers should be understood differently in the Michigan Constitution because the words “case” and “controversy” are not in our constitution suggests to us that Justice WEAVER fundamentally misunderstands the doctrine of separation of powers. She refuses to accept that there is a constitutional limit on the Legislature’s authority to expand “judicial power” in the area of standing. In response, we stated in Nat’l Wildlife that
[a]s the Michigan Constitution makes clear, the duty of the judiciary is to exercise the “judicial power,” and, in so doing, to respect the separation of powers. While as a *308 general proposition, the proper exercise of the “judicial power” will obligate the judiciary to give faithful effect to the words of the Legislature — for it is the latter that exercises the “legislative power,” not the judiciary — such effect cannot properly be given when to do so would contravene the constitution itself. Just as the judicial branch owes deference to the legislative branch when the “legislative power” is being exercised, so too does the legislative branch owe deference to the judicial branch when the exercise of the “judicial power” is implicated. Even with the acquiescence of the legislative and executive branches, the judicial branch cannot arrogate to itself governmental authority that is beyond the scope of the “judicial power” under the constitution. The “textual” approach of [Justice Weaver] is a caricatured textualism, in which the Legislature is empowered to act beyond its authority in conferring powers upon other branches that are also beyond their authority. [Nat’l Wildlife, 471 Mich at 637 (citations omitted; emphasis in original).]
Equally perplexing is Justice Weaver’s continued insistence that by refraining from exercising our “judicial power” where plaintiffs fail to allege an injury in fact, we have actually failed to show judicial restraint. Such reasoning turns “reality on its head.”[57] In response, we simply reiterate that by acting within the limits of the “judicial power” accorded by our constitution, we have not expanded our power and we have not encroached on the powers granted to the other branches of government.[58]
Her doctrinal misunderstandings aside, Justice Weaver’s core “political point” is that, in insisting on constitutional standing requirements, we have eviscerated environmental laws intended to protect Michigan’s natural resources, leaving Michigan residents helpless *309 to protect those resources threatened by environmental harm. Needless to say, her bleak, apocalyptic visions are false. Our holding today does not strip the Legislature or Michigan residents of their ability to protect this state’s natural resources. What we have done is recognized an established constitutional line on our judicial authority to adjudicate what would otherwise be public policy-oriented lawsuits brought by persons who have no immediate stake in the controversy.
Environmental laws, such as MEPA (or any'statutory law for that matter), may be vindicated by persons who have suffered a real injury in fact and thus have a stake in the controversy. Such is the case here with respect to plaintiffs’ MEPA claim to protect the Dead Stream and Thompson Lake. Moreover, environmental laws are also always enforceable by the executive branch through entities such as the MDEQ. If the people are unhappy with how the executive branch fulfills its enforcement functions, the remedy is not a lawsuit, but a political one at the ballot box.
Finally, just as we stated in Nat’l Wildlife, we have yet to find any support, textual or otherwise, other than Justice Weaver’s assertion, for her contention that Const 1963, art 4, § 52 renders standing principles inapplicable in matters of environmental concern.[59] In Nat’l Wildlife, we noted that with respect to the mandates stated in constitutional provisions such as art 4, § 52, “it is implicit. .. that the Legislature is to pursue these goals by appropriate means” rather than by unconstitutional methods.[60] Therefore, there is no reason to presume that the Legislature can discard standing requirements in order to carry out its mandate in art 4, § 52, and Justice WEAVER fails to provide one.
*310 VI. CONCLUSION
Plaintiffs have standing to bring a MEPA claim against Nestlé to protect their riparian property rights in Thompson Lake and the Dead Stream. However, plaintiffs have not alleged an injury in fact with respect to the Osprey Lake Impoundment and Wetlands 112, 115, and 301 because there is no evidence that they use these areas and that their recreational, aesthetic, or economic interests have been impaired by Nestlé’s pumping activities. Accordingly, we affirm the Court of Appeals in part, but we reverse the Court of Appeals holding with regard to this issue and remand this case to the trial court for further proceedings consistent with this opinion.
Taylor, C.J., and Corrigan and Markman, JJ., concurred with YOUNG, J.

 MCL 324.1701 et seq.

 471 Mich 608; 684 NW2d 800 (2004).

 Id. at 629, quoting Friends of the Earth, Inc v Laidlaw Environmental Services (TOC), Inc, 528 US 167, 183; 120 S Ct 693; 145 L Ed 2d 610 (2000) (citation omitted).

 The trial court referenced the “Dead Stream wetlands” in addition to the Dead Stream. These wetlands are found in and around the Dead Stream. For purposes of this case, we refer to the Dead Stream itself and its related wetlands collectively as the Dead Stream.

 The Bollmans are not part of this appeal.

 In order for Nestlé to bottle and market its product as spring water, the source had to satisfy the definition of “spring water” established by the federal Food and Drug Administration (FDA).

 MCL 325.1001 et seq. The Legislature subsequently amended the Safe Drinking Water Act and other legislation to further regulate water diversion and bottling in Michigan. See, e.g., 2006 PA 33; 2006 PA 34; *287 2006 PA 35; 2006 PA 37. Because these acts did not take effect until after the trial court and the Court of Appeals issued their decisions, we do not address this legislation in this opinion.

 Count I requested an injunction to prevent the construction of wells, wellhouses, and pipelines to transport water to the Stanwood facility. Count II alleged that Nestlé violated common-law riparian rights. Count III similarly claimed that the pumping violated common-law rules *288 governing diversion of groundwater. Count IV alleged that Nestle violated the public trust by withdrawing the spring water. Count V stated that Nestlé’s use constituted an unlawful taking of public resources. Count VI claimed that Nestlé’s activities violated MEPA. The second amended complaint also added the Doyles and the Sapps as co-plaintiffs.

 The “zone of influence” included the Dead Stream, Osprey Lake, Thompson Lake, and Wetlands 115, 112, and 301. The “hydrological effects” section of the opinion described the reduced flow and water levels in the lakes, streams, and wetlands that the court attributed to the pumping. The “ecological impacts” section of the opinion summarized the predicted ecological consequences that the court causally linked to the reduced flow and water level in those bodies of water.

 With respect to the common-law groundwater claim, the court found that this case involved an unprecedented intersection of Nestlé’s groundwater rights with plaintiffs’ riparian rights. After reviewing Michigan common law in this area, the court developed a test that, if groundwater and riparian rights clash and a hydrological connection is proven, riparian rights take priority above groundwater rights. If the groundwater use removes the water from the watershed, then any such use may not reduce natural flow to a riparian body. Applying this test, the court concluded that Nestlé’s withdrawals of spring water impaired plaintiffs’ riparian rights.
With respect to the MEPA claim, the court found that plaintiffs established an unrebutted prima facie case that Nestlé’s pumping activi *289 ties violated environmental standards drawn from the inland lakes and streams act, MCL 324.30101 et seq., and the wetland protection act, MCL 324.30113 et seq.

 Michigan Citizens for Water Conservation v Nestlé Waters North America Inc, 269 Mich App 25; 709 NW2d 174 (2005). Before Nestlé’s appeal of right, the Court of Appeals granted Nestlé’s requested stay of the injunction and set a maximum pump rate of 250 gallons per minute. That rate was reduced to 200 gallons per minute after the Court of Appeals issued its opinion.

 Nestlé also appealed the common-law groundwater claim. The panel adopted a different test from that applied by the trial court. Derived from earlier Michigan cases, this “reasonable use” balancing test required a case-by-case application of principles of ensuring fair participation, protecting only reasonable uses, and prohibiting only unreasonable harms. See, e.g., Dumont v Kellogg, 29 Mich 420 (1874); Maerz v United States Steel Corp, 116 Mich App 710; 323 NW2d 524 (1982). The Court of Appeals concluded that under this test Nestlé’s pumping at 400 gallons per minute was unreasonable. It remanded this issue to the trial court to determine the appropriate level of pumping.

 Michigan Citizens, 269 Mich App at 113 (opinion of Murphy, EJ.).

 Id. at 83.

 MCL 324.1701(1) states:
The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.

 Michigan Citizens, 269 Mich App at 87.

 464 Mich 726; NW2d 900 (2001).

 The Court of Appeals also resolved other issues. It rejected defendant’s argument that the trial court’s factual findings were clearly erroneous and that the trial court abused its discretion when it refused to grant defendant’s request to reopen the proofs or supplement the record. It also affirmed the trial court’s dismissal of plaintiffs’ public trust claim. Additionally, the Court of Appeals agreed with defendant that the trial court erred by granting plaintiffs’ motion for costs as prevailing parties.
*291 Judge White also filed a separate opinion pertaining to a matter unrelated to the standing issue decided in this case.

 477 Mich 892 (2006).

 Lee, 464 Mich at 734.

 475 Mich 363, 369-370; 716 NW2d 561 (2006).

 See also Const 1963, art 4, § 1 (vesting the “legislative power” in a senate and a house of representatives); Const 1963, art 5, § 1 (vesting the “executive power” in the governor); Const 1963, art 6, § 1 (vesting the “judicial power ... exclusively in one court of justice”).

 Lee, 464 Mich at 735. See generally Nat’l Wildlife, 471 Mich at 612-628 (thoroughly discussing standing, separation of powers, and the proper exercise of “judicial power”).

 Nat’l Wildlife, 471 Mich at 615.

 See Comment: Article III limits on statutory standing, 42 Duke L J 1219, 1220, 1221 (1993); see also Scalia, The doctrine of standing as an essential element of the separation of powers, 17 Suffolk ULE 881, 890-893 (1983) (discussing the relationship between separation of powers and the doctrine of standing).

 Article III Limits, 42 Duke L J at 1230.

 547 US 126 S Ct 1854, 1861; 164 L Ed 2d 589 (2006), quoting 4 Papers of John Marshall 95 (C Cullen ed, 1984).

 Lee, 464 Mich at 738-739, quoting House Speaker v Governor, 441 Mich 547, 554; 495 NW2d 539 (1993).

 Concerning Justice Cavanagh’s dissent, we are perplexed about how he would analyze standing cases. The United States Supreme Court decision in Lujan v Defenders of Wildlife, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992), is the most significant recent judicial pronouncement on standing. In Detroit Fire Fighters Ass’n v Detroit, 449 Mich 629, 650-651; 537 NW2d 436 (1995), Justice CAVANAGH affirmatively cited Lujan to conclude that a labor union had standing. In Lee, 464 Mich at 750, joining Justice Kelly’s dissent, he again “agree[d] with the majority’s adoption of the Lujan test.” Then, in Nat’l Wildlife, 471 Mich at 676, Justice Cavanagh “disavow[ed]” his previous position and concluded that “Lujan should not be used to determine standing in this state.” Finally, in this case, he favorably cites Lujan, post at 322-323, while also joining a dissent that concludes that Lujan is inapplicable in this state. In short, on an issue of enormous constitutional consequence, Justice Cavanagh has, without much explanation, adopted a variety of seemingly inconsistent positions. Under these circumstances, it would seem to behoove Justice Cavanagh to demonstrate somewhat greater reservation than he does before joining a dissenting opinion in which the political motivations of the majority justices are called into question without justification— justices who have consistently adhered to the same constitutional position on standing over the years without regard to the parties or interests involved. See, e.g., Lee, supra; Nat’l Wildlife, supra; Michigan Chiropractic Council, supra; Rohde, infra.

 Nat’l Wildlife, 471 Mich at 629, quoting Laidlaw, 528 US at 133 (citations omitted).

 Laidlaw, 528 US at 184.

 Nat’l Wildlife, 471 Mich at 629; Trout Unlimited, Muskegon White River Chapter v White Cloud, 195 Mich App 343, 348; 489 NW2d 188 (1992).

 Of course, in the process of protecting plaintiffs’ riparian rights in the Dead Stream and Thompson Lake, a successful MEPA claim may have the incidental effect of protecting Osprey Lake and Wetlands 112, 115, and 301 because the common source of the environmental harm that the trial court found in the entire region was Nestlé’s pumping activity.

 528 US 167, 181; 120 S Ct 693; 145 L Ed 2d 610 (2000).

 See, e.g., Sierra Club v Morton, 405 US 727; 92 S Ct 1361; 31 L Ed 2d 636 (1972); Worth v Seldin, 422 US 490; 95 S Ct 2197; 45 L Ed 2d 343 (1975).

 504 US at 555, 565 (emphasis in original).

 Id. at 565-566.

 241 F3d 674 (CA 9, 2001).

 Id. at 680-681.

 Nat’l Wildlife, 471 Mich at 630.

 In response to our order granting oral argument on the application, MDEQ and, collectively, the National Wildlife Federation, Michigan United Conservation Clubs, Tip of the Mitt Watershed Council, Pickerel-Crooked Lakes Association, and Burt Lake Preservation Association filed amicus briefs supporting plaintiffs.

 See Const 1963, art 4, § 52, which declares that “[t]he conservation and development of the natural resources of the state are... of paramount public concern in the interest of the health, safety and general welfare of the people.” The provision then directs the Legislature to “provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.”

 MCL 324.1701(1).

 471 Mich at 636.

 Cf. Const 1963, art 9, § 32 (“Any taxpayer of the state shall have standing to bring suit... to enforce the provisions of Sections 25 through 31....”).

 Nat’l Wildlife, 471 Mich at 636-637. See also Rohde v Ann Arbor Pub Schools, 479 Mich 336; 737 NW2d 158 (2007) (holding MCL 129.61 unconstitutional because it grants any resident taxpayer the right to sue even if the resident taxpayer fails to satisfy the three-part test for standing).

 Defendant and its supporting amici urge this Court to find MCL 324.1701(1) unconstitutional because it is an attempt by the Legislature to confer broader standing than what is constitutionally permitted. We decline this invitation. Although plaintiffs do not have standing with respect to every body of water identified by the trial court, they do have standing with respect to Thompson Lake and the Dead Stream, as defendant concedes. Therefore, this Court has no reason to consider the constitutionality of MCL 324.1701(1) because it is unnecessary to the resolution of this case.

 Nat’l Wildlife, 471 Mich at 636-637; see also Rohde, 479 Mich at 346-355.

 Post at 327, quoting Warth, 422 US at 501.

 Justice Kelly’s position would, in fact, create a significant loophole in standing doctrine. Assuming that plaintiffs could assert the general public’s interest in preventing environmental destruction in support of their MEPA claim, it is unclear how the general public interest, as Justice Kelly defines it in this case, could confer standing that plaintiffs otherwise lack with respect to Osprey Lake and Wetlands 112,115, and 301.

 Warth, 422 US at 501 (emphasis added). See also Cuno, 126 S Ct at 1867 (“[A] plaintiff must demonstrate standing for each claim he seeks to press.”); Laidlaw, 528 US at 185 (“[A] plaintiff must demonstrate standing separately for each form of relief sought.”).

 405 US 727; 92 S Ct 1361; 31 L Ed 2d 636 (1972).

 Worth, 422 US at 501.

 Justice Kelly overstates the significance that the “general public interest” language from Warth enjoys in federal standing jurisprudence. The United States Supreme Court in Sierra Club, one of the cases on which Warth relied, stated that a party with standing “may argue the public interest in support of his claim that [a federal] agency has failed to comply with its statutory mandate.” Sierra Club, 405 US at 737. The Sierra Club Court focused on the standing requirements for a party seeking judicial review of federal agency actions. Thus, Warth clearly drew its dictum about the general public interest from the context of administrative law. Moreover, every gost-Wurth federal district court and circuit court case cited by Justice Kelly involved a federal agency’s alleged failure to fulfill its statutorily prescribed administrative duties, which indicates that Warth’s dictum has not been expanded outside its original administrative law context. Assuming that we were bound to follow this line of cases, which Justice Kelly acknowledges that we are not, it would not have any bearing on this case in any event because plaintiffs have not alleged that a state agency such as MDEQ has neglected its statutory responsibilities. Finally, we are unaware of any United States Supreme Court decision, particularly one decided after Lujan, that has applied the dictum from Warth in the manner advocated by Justice Kelly. Indeed, two current members of the Court, Justices Scalia and Thomas, have recently criticized other language from Warth as dicta. See Hein v Freedom from Religion Foundation, Inc,_US_; 127 S Ct 2553; 168 L Ed 2d 424 (2007) (Scalia, J. concurring in the judgment) (criticizing earlier Supreme Court cases that described the prohibition on generalized grievances as merely a prudential bar rather than an Article III standing consideration and characterizing Warth as the “fountainhead” of this dicta). Thus, we would be wise to carefully and critically consider dicta from Warth, and we believe we have done so.

 However, if Warth truly stood for the proposition urged by Justice Kelly, it would violate the separation of powers principles upon which Michigan’s constitutional standing requirements rest and should be rejected on that ground.

 See Nat’l Wildlife, 471 Mich at 625-628. Interestingly, the Constitution of the Commonwealth of Massachusetts, which predated our federal constitution, articulates the principle of separation of powers in language quite similar to 1963 Const, art 3, § 2. See Scalia, The doctrine of standing as an essential element of the separation of powers, 17 Suffolk U L R 881 (1983) (quoting pt 1, art XXX of the Massachusetts Constitution, which states that “the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers or either of them; the judicial shall never exercise the legislative and executive powers, or either of them____”).

 Nat’l Wildlife, 471 Mich at 639; see also text and accompanying footnotes at pp 293-294 of this opinion.

 Nat’l Wildlife, 471 Mich at 639-640.

 Nat’l Wildlife, 471 Mich at 634-635.

 Id. at 635 (emphasis in original).