YOUNG, J.
(dissenting). Our new Chief Justice established the “agenda” for the newly reconstituted Court in her recent comments captured by the press:
We the new majority [Chief Justice Kelly and Justices Cavanagh, Weaver, and Hathaway] will get the ship off the shoals and back on course, and we will undo a great deal of the damage that the Republican-dominated court has done. Not only will we not neglect our duties, we will not sleep on the bench.[1]
*533 There are many cases this term that can be said to exemplify the new majority’s commitment to “undo . . . the damage” of the prior majority, but this case certainly qualifies as a first among equals. Here, not only do my colleagues in the “new majority” destroy the doctrinal integrity of medical malpractice law, they do so in highly fractured opinions that will require a Venn diagram for the bench and bar to construct the points at which four of them agree on any governing principle of law. The new majority has thus made it more difficult to determine what it has done today. Perhaps this is intended.
Chaos and confusion in the law only promote more litigation. The decisions the new majority has issued today in this case will thus benefit only those who profit from litigating medical malpractice cases. The rest of us desire to know what legal rules control our rights and obligations, and we desire and deserve to know them before we act. The citizens of this state are entitled to that kind of clarity in the decisions from the state’s senior court, not the disorder this Court has sown today. Today’s decision returns this Court to an era in which the bench and bar must decipher this Court’s split opinions in order to figure out what principles of law they collectively articulate. [2] It is no small challenge to respond in dissent to the various opinions that shred our medical malpractice laws.
*534 Despite the Legislature’s codification of the traditional obligation to prove that alleged malpractice “more probably than not” caused a plaintiffs injury,[3] 20 years ago, in Falcon v Mem Hosp, this Court waded into the realm of policy-making and judicially created the lost opportunity doctrine as an exception to the traditional and statutorily codified causation standard of proof.[4] Even after the Legislature subsequently recognized the lost opportunity doctrine,[5] it also expressly retained the traditional requirement that “[i]n an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants.”[6]
Until today, this Court has always made clear that when a traditional medical malpractice claim was at issue, the more-probable-than-not standard of causation applied and required the plaintiff to “ ‘exclude other reasonable hypotheses with a fair amount of certainty.’ ”[7] However, as the Court did in Falcon, today the majority makes a radical transformation of medical malpractice law and again jettisons traditional causation doctrine by equating causation of the injury with risk of the injury. But, unlike in Falcon, the new majority here does not recognize merely an exception to the traditional malpractice requirement of “but for” causation, it essentially eliminates the traditional rule entirely by importing that exception into all malpractice cases. In declaring this case to be a “traditional” medi *535 cal malpractice claim, the new majority applies the relaxed causation rules that previously had applied only to lost opportunity claims. After today, therefore, all malpractice claims will be treated under relaxed causation principles previously applied only to lost opportunity claims. This is a tectonic shift in our law, for which there is no basis but the preference of the justices in the new majority to foster more legal chaos that will promote litigation in this area of the law. This shift is significant because a traditional medical malpractice injury creates liability for the entire injury, while a lost opportunity claim creates liability only for that portion of the increased risk of injury attributable to a defendant.[8] Make no mistake: Although Justice CAVANAGH feigns that he is unaware of the significant change in the law being made in this case, the reduced burden of persuasion and the broader scope of damages permitted is the reason the new majority now applies lost opportunity causation principles to all medical malpractice claims.[9]
Rather than attempting to give meaning to the words of the statute at issue in this case, the new majority performs a spectacularly hubristic feat in treating a statutory medical malpractice claim as though it were a mere matter of common law and thus subject to its revisionary powers. What is more, these justices have decided to use those extraconstitutional powers to circumvent the Legislature’s explicit decision to retain traditional causation rules. The new majority has cho *536 sen “free form” to change the law to match its policy preference that no legal doctrines shall exist to eliminate any claim of medical malpractice — even those doctrines codified by our Legislature to accomplish this very goal.
For someone who campaigned on the theme that more of this Court’s precedent should be preserved,[10] we are surprised at how eagerly Justice HATHAWAY has striven in this case to overturn precedent — even to the extent of offering her own new views that precedent is not a serious barrier to any change desired by the new majority. [11]
The dicta in Justice Hathaway’s opinion bears out her newfound position on stare decisis because her opinion purports to opine on “the full scope and extent of loss-of-opportunity claims,”[12] even while denying that such a claim is involved in this case. In doing so, Justice HATHAWAY engages in a completely gratuitous assault on this Court’s decision in Wickens v Oakwood Healthcare Sys.[13] Wickens involved a claim for the lost opportunity to survive, and it was brought by a living plaintiff — someone who had not yet lost her opportunity to survive. No justice even contends that plaintiff in this case has asserted a claim for the lost opportunity *537 to survive, and therefore it is completely unnecessary for Justice HATHAWAY to opine on whether the majority or dissent correctly interpreted the question whether a living plaintiff could recover for the loss of an opportunity to survive.
Ordinarily, this fact would hinder any justice from engaging in a discussion on the scope of a claim for the lost opportunity to survive that is not implicated in the case before the Court. Justice HATHAWAY, though, is not constrained to consider only the legal issues she claims are involved here because, consistent with the new majority’s “agenda,”[14] she has a desire to overrule in one fell swoop as many cases decided by the “Republican-dominated court” as she can. Unfazed by the inconvenient fact that Wickens is irrelevant to any question posed by this case, Justice Hathaway’s opinion observes that it “agree[s] with Justice CAVANAGH’s partial dissent in Wickens . . . .”[15] Such dicta do not yet operate to overturn this Court’s decision in Wickens. Nevertheless, given that Justice HATHAWAY is now the fourth sitting justice on this Court to support the partial dissenting opinion in Wickens, it is safe to conclude that the majority opinion in Wickens has, more probably than not, lost a substantial part of its opportunity to survive.[16]
Finally, the new majority overrules the Court of Appeals’ decision in Fulton v William Beaumont Hosp *538 to the extent it is inconsistent with their opinions.[17] However, again, the new majority overreaches; Fulton applies only to lost opportunity cases, not to traditional medical malpractice cases, and the new majority’s decision to convert claims previously considered lost opportunity claims into traditional medical malpractice claims serves to eliminate the application oí Fulton. The new majority’s deliberate decision to repudiate Fulton in this expansive manner provides further support for my claim that it now applies lost opportunity principles to all medical malpractice claims.
For these reasons and more, I vigorously dissent. I believe that the new majority has intentionally mischaracterized this as a “traditional” medical malpractice claim because plaintiffs expert testimony unquestionably established that the alleged malpractice was not the “but for” cause of plaintiffs injury. Were the new majority’s characterization of this case as a traditional medical malpractice claim accurate, I would affirm for failure of proofs. However, because I believe this to be a lost opportunity case, I would vacate as improvidently entered our September 30, 2009, order granting leave to appeal. I continue to adhere to the position stated in the lead opinion in Stone v Williamson that the second sentence of MCL 600.2912a(2) codifying the lost opportunity remedy is unenforceable as enacted.[18] Because the Legislature has not clarified the intention of its 1993 amendment of § 2912a(2), vacating the grant order is the most appropriate course of action.
I. FACTS AND PROCEDURAL HISTORY
Because none of the opinions that collectively create *539 a majority elaborates on the facts necessary to decide this case, I present the following complete recitation of the pertinent facts and procedural history of this case.
Plaintiff, Raymond O’Neal, suffers from sickle cell anemia, a genetic condition that produces an increased amount of abnormally shaped red blood cells in his bloodstream.[19] In January 2003, plaintiffs progressively worsening chest pain developed into acute chest syndrome (ACS), a known complication of sickle cell anemia.[20] To treat ACS, a patient must undergo blood transfusions to reduce the amount of abnormal red blood cells. The difference between and effectiveness of two types of blood transfusions — standard transfusions and exchange transfusions — is at issue in this case. Standard transfusions add healthy red blood cells to the patient’s existing blood supply and thereby reduce the patient’s percentage of abnormal red blood cells. Exchange transfusions are more complicated, but they also more aggressively treat the blood abnormality because they physically remove existing abnormal red blood cells and replace them with healthy red blood cells.
On January 23 through 24, 2003, plaintiff received a standard transfusion of three units of blood cells. He received two additional units of blood cells in another standard transfusion on January 28, 2003. Plaintiff suffered a stroke on the right side of his brain on February 1, 2003. Plaintiff received a third transfusion — an exchange transfusion — on February 2 through 3, 2003. Plaintiffs condition stabilized after this final transfusion, but he alleged permanent injury *540 as a result of the stroke, including partial paralysis of his left leg and loss of function of his left hand and arm.
Plaintiff filed the instant medical malpractice complaint, alleging that defendants failed to comply with the appropriate standard of care, which required them to “arrange for exchange transfusions” to treat plaintiffs ACS on or before January 28,2003. He also alleged that “[p]er for manee of [an] exchange transfusion prior to the . . . stroke would have prevented the stroke from occurring.”
Plaintiff retained and deposed three expert witnesses to testify on his behalf on the issue of causation. Dr. John Luce, a pulmonary care specialist, testified that reducing plaintiffs abnormal hemoglobin concentration to under 30 percent would have made it “probable that he would not have” suffered the stroke, although he acknowledged that plaintiff still could have suffered the stroke even with such a reduced abnormal hemoglobin concentration. Because no data existed on the frequency of strokes in adult sickle cell patients, Dr. Richard Stein, a hematologist, extrapolated from existing data on the effects of aggressive transfusion therapy on children with sickle cell disease. He testified that “more likely than not” plaintiff would have avoided a stroke if he had received aggressive transfusion therapy, what plaintiff alleged is the appropriate standard of care. Dr. Griffin Rodgers, also a hematologist, provided the most detailed testimony regarding the causal relationships between the stroke, plaintiffs underlying medical condition, and defendants’ alleged malpractice. He explained that sickle cell patients generally have a baseline risk of stroke that is significantly higher than the average population. Moreover, plaintiffs ACS further increased his baseline risk of stroke to between 10 and 20 percent. Dr. Rodgers testified that, with aggres *541 sive transfusion therapy, plaintiffs risk of stroke would have “been cut in half,” that is, to between 5 and 10 percent. Stated otherwise, plaintiffs opportunity to avoid a stroke would have been between 90 and 95 percent with aggressive transfusion therapy, but it was reduced to between 80 and 90 percent without aggressive transfusion therapy. Thus, under either treatment regime, plaintiffs experts testified that it was more likely than not that plaintiff would avoid a stroke.
Defendants moved for summary disposition, arguing that Dr. Rodgers’s testimony regarding plaintiffs lost opportunity to avoid a stroke failed to satisfy the requirement of MCL 600.2912a(2)[21] and Fulton[22] that the opportunity to achieve a better result must decrease by more than 50 percentage points. The trial court denied defendants’ motion, noting that defendants “[didn’t] have a clue about what [Fulton] says.”
After the Court of Appeals denied defendants’ interlocutory application for leave to appeal, in lieu of granting leave to appeal, we remanded this case to the Court of Appeals for consideration as on leave granted.[23] On remand, the Court of Appeals reversed the trial court’s denial of summary disposition in an unpublished opinion per curiam.[24] The majority opinion held that plaintiffs claim was a lost opportunity claim, that Fulton required the loss of opportunity to be greater than 50 percentage points, and that the loss of oppor *542 tunity here was, at most, 15 percentage points. The concurring opinion concluded that plaintiff also failed to present sufficient evidence of proximate causation because his “preexisting medical condition” precluded him from satisfying “his burden of establishing the existence of a genuine factual dispute concerning whether defendants’ alleged professional negligence ‘more probably tha[n] not’ proximately caused his stroke.”[25]
We granted leave to appeal and directed the parties to brief:
(1) whether the requirements set forth in the second sentence of MCL 600.2912a(2) apply in this case; (2) if not, whether the plaintiff presented sufficient evidence to create a genuine issue of fact with regard to whether the defendants’ conduct proximately caused his injury; or (3) if so, whether Fulton v William Beaumont Hosp, 253 Mich App 70 (2002), was correctly decided, or whether a different approach is required to correctly implement the second sentence of § 2912a(2).[26]
II. LEGAL BACKGROUND
The lead opinion in Stone aptly summarized the pertinent legal background relevant to this case, including the distinction between traditional malpractice claims and lost opportunity claims that the majority now eviscerates:
In the first Michigan case to refer to the legal theory of “the value of lost chance,” the Court of Appeals explained: “This theory is potentially available in situations where a plaintiff cannot prove that a'defendant’s actions were the cause of his injuries, but can prove that the defendant’s actions deprived him of a chance to avoid those injuries.” Vitale v Reddy, 150 Mich App 492, 502; 389 NW2d 456 *543 (1986). The Court in Vitale noted that allowing such claims would expand existing common law, and it declined to do so, stating that such a decision “is best left to either the Supreme Court or the Legislature.” Id. at 504. ...
In accord with this analysis, this Court has stated: “The lost opportunity doctrine allows a plaintiff to recover when the defendant’s negligence possibly, i.e., [by] a probability of fifty percent or less, caused the plaintiffs injury.” Weymers v Khera, 454 Mich 639, 648; 563 NW2d 647 (1997) (emphasis added). The Weymers Court aptly described the lost-opportunity doctrine as “the antithesis of proximate cause.” Id. In cases in which the plaintiff alleges that the defendant’s negligence more probably than not caused the injury, the claim is one of simple medical malpractice. Id. at 647-648.
In Falcon v Mem Hosp, 436 Mich 443; 462 NW2d 44 (1990), this Court first recognized a claim for lost opportunity to survive. Falcon was a wrongful-death case in which this Court allowed a claim to go forward even though the plaintiffs granddaughter would have had only a 37.5 percent chance of surviving a medical accident had she received proper care. Because proper medical procedures had not been followed, the granddaughter’s chance of surviving the accident went to essentially zero. The lead opinion in Falcon admitted that the plaintiff could not show that the malpractice had more likely than not caused her granddaughter’s death, but could show that it had caused her granddaughter to lose a “substantial opportunity of avoiding physical harm.” Id. at 470 (Levin, J.). The lead opinion disavowed the traditional rule that requires a plaintiff to show that, but for the defendant’s negligence, the patient would not have suffered the physical harm, saying that the “more probable than not standard, as well as other standards of causation, are analytic devices — tools to be used in making causation judgments.” Id. at 451. Instead, despite the fact that the plaintiff could not show that the doctor’s malpractice had more probably than not caused her granddaughter’s death, the plaintiff had a claim because the malpractice did cause her granddaughter harm. The 37.5 percent chance for a better outcome was *544 “hardly the kind of opportunity that any of us would willingly allow our health care providers to ignore.” Id. at 460. This harm occurred before the granddaughter’s death, at the moment “[w]hen, by reason of the failure to implement [certain] procedures,” she was denied any opportunity of living. Id. at 469, 471 n 44. The lead opinion characterized its holding as requiring the plaintiff to show, more probably than not, that the malpractice reduced the opportunity of avoiding harm: “failure to protect [the granddaughter’s] opportunity of living.” Id. at 469. Loss of her 37.5 percent opportunity of living, the lead opinion stated, “constitutes a loss of a substantial opportunity of avoiding physical harm.” Id. at 470.
The lead opinion in Falcon thus concluded that the loss-of-opportunity claim accrued not when the patient died, but at the moment she went from having a 37.5 [percent] chance of survival to having no chance of survival. Under this theory, a plaintiff would have a cause of action independent of that for the physical injury and could recover for the malpractice that caused the plaintiff to go from a class of patients having a “good chance” to one having a “bad chance.” Without this analysis, the plaintiff in Falcon would not have had a viable claim because it could not have been shown that the defendant more probably than not caused the physical injury. Until Falcon, medical-malpractice plaintiffs alleging that the defendant’s act or omission hastened or worsened the injury (such as by failing to diagnose a condition) had to prove that the defendant’s malpractice more probably than not was the proximate cause of the injury. See, e.g., Morgan v Taylor, 434 Mich 180; 451 NW2d 852 (1990); Naccarato v Grob, 384 Mich 248, 252; 180 NW2d 788 (1970); Skeffington v Bradley, 366 Mich 552; 115 NW2d 303 (1962).
When the Court decided Falcon, MCL 600.2912a read:
“In an action alleging malpractice the plaintiff shall have the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:
“(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable *545 professional practice in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
“(b) The defendant, if a specialist, failed to provide the recognized standard of care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.”
Three years after Falcon, the Legislature enacted 1993 PA 78, amending MCL 600.2912a to add the second subsection. In its entirety, the statute as amended reads:
“(1) Subject to subsection (2), in an action alleging malpractice, the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:
“(a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
“(b) The defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances, and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
“(2) In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.” [New language emphasized.]
*546 As can be seen, the Legislature retained the already-existing language, making it subsection 1 of the statute. Both subsection 1(a) and subsection 1(b) require the plaintiff to show that, “as a proximate result of the defendant failing to provide [the appropriate standard of practice or care], the plaintiff suffered an injury.” Further, the Legislature added subsection 2. Specifically, the first sentence of this new subsection codifies and reiterates the common-law requirement that a plaintiff show that the defendant’s malpractice more probably than not caused the plaintiffs injury The second sentence of subsection 2 adds that, in medical-malpractice cases, a “plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%. ” However, one must keep in mind that the relevant caselaw when subsection 2 was enacted held that the lost-opportunity doctrine applies “in situations where a plaintiff cannot prove that a defendant’s actions were the cause of his injuries ....” Vitale, [150 Mich App] at 502 (emphasis added). That is, the first sentence of subsection 2 requires plaintiffs in every medical-malpractice case to show the defendant’s malpractice proximately caused the injury while, at the same time, the second sentence refers to cases in which such proof not only is unnecessary, but is impossible.[27]
Thus, in contrast with traditional malpractice claims, the very nature of the lost opportunity doctrine allows a plaintiff to recover in the absence of proximate causation between the alleged malpractice and the physical injury suffered. The lead opinion in Stone determined that “the two sentences of subsection 2 create a paradox, allowing claims in the second sentence while precluding them by the first sentence.”[28] In this case, Justice Hathaway’s opinion and Justice CAVANAGH’s concurring opinion altogether avoid the implications of this paradox by essentially applying the lost opportunity analysis *547 (which never required “but for” causation) to a traditional medical malpractice claim that, until today, always required “but for” causation. In doing so, the new majority radically alters proximate causation doctrine by casting aside the traditional component of “but for” causation and by replacing causation of the injury with consideration only of the increased risk of the injury. This is a revolutionary change in our law and represents a change that not even the Falcon Court dared to make.
A necessary component of proximate causation is “but for” causation, or causation in fact.[29] As this Court has previously held:
As a matter of logic, a court must find that the defendant’s negligence was a cause in fact of the plaintiffs injuries before it can hold that the defendant’s negligence was the proximate or legal cause of those injuries.
Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or “but for”) that act or omission. While a plaintiff need not prove that an act or omission was the sole catalyst for his injuries, he must introduce evidence permitting the jury to conclude that the act or omission was a cause.
It is important to bear in mind that a plaintiff cannot satisfy this burden by showing only that the defendant may have caused his injuries. Our case law requires more than a mere possibility or a plausible explanation. Rather, a plaintiff establishes that the defendant’s conduct was a cause in fact of his injuries only if he “set[s] forth specific facts that would support a reasonable inference of a logical sequence of cause and effect.”[30]
*548 As Justice CAVANAGH has himself previously concluded, plaintiffs must present evidence of proximate causation that “ ‘must exclude other reasonable hypotheses with a fair amount of certainty.’ ”[31] By allowing plaintiffs claim to proceed as a traditional medical malpractice claim, the new majority today eviscerates the distinction between the weaker causation allowed in lost opportunity claims and the “but for” causation that has always been required in traditional medical malpractice claims.
III. APPLICATION
A. PLAINTIFF ASSERTED A LOST OPPORTUNITY CLAIM BECAUSE THERE IS NO “BUT FOR” CAUSATION BETWEEN THE ALLEGED MALPRACTICE AND THE PHYSICAL INJURY SUFFERED
As stated, the crux of a lost opportunity claim is that a plaintiff cannot show that, more probably than not, the alleged malpractice proximately caused his injuries. This is because a plaintiff need only show that the alleged malpractice merely reduced his opportunity to achieve a better result. Accordingly, whether a claim is a traditional malpractice claim or a claim for the loss of an opportunity to achieve a better result depends on whether the alleged malpractice proximately caused the alleged injury.
Contrary to the new majority’s position, this case presents a prototypical lost opportunity claim because no proximate causation exists between the alleged malpractice and plaintiff’s physical injury. Plaintiffs experts testified that plaintiffs underlying medical condition — sickle cell anemia complicated by ACS— increased his risk of stroke above that of a healthy person and even above that of a sickle cell patient who *549 has not developed ACS. Plaintiffs underlying medical condition created a heightened chance of suffering a stroke, with or without the alleged malpractice. As Dr. Rogers, who provided the most detail of plaintiffs causation experts, testified, plaintiff would have had a 5 to 10 percent chance of suffering a stroke even if he had been treated according to the plaintiff’s proposed standard of care.
The evidence here, therefore, does not “ ‘exclude other reasonable hypotheses [of the cause of injury] with a fair amount of certainty,’ ”[32] as is required to prove “but for” causation in a traditional medical malpractice action. Plaintiffs expert testified that, in the absence of the alleged medical malpractice, plaintiff had between a 90 percent and 95 percent chance of avoiding a stroke. The alleged medical malpractice reduced plaintiffs chance of avoiding a stroke to between 80 percent and 90 percent. Even looking at the evidence in the light most favorable to the plaintiff, there is no basis for a fact-finder to conclude that defendants’ actions more probably than not caused plaintiffs injury. But this is unimportant because the new majority now only requires causation for the increased risk of injury.
Simply stated, the plaintiff has not asserted — and neither Justice Hathaway’s opinion nor Justice CAVANAGH’s concurring opinion assert — that the alleged medical malpractice increased his chance of suffering a stroke by the more than 50 percentage points required to prove proximate causation.[33] This fact irrefutably establishes *550 that the plaintiff asserts a lost opportunity claim, not a traditional medical malpractice claim.
B. THE CONCLUSION THAT PLAINTIFF HAS ASSERTED A TRADITIONAL MEDICAL MALPRACTICE CLAIM AND HAS SATISFIED THE REQUIREMENTS OF “BUT FOR” CAUSATION IS A DANGEROUS DEPARTURE FROM TRADITIONAL CAUSATION REQUIREMENTS
As stated, in determining that plaintiffs claim is a traditional medical malpractice claim, the new majority today applies relaxed causation rules that previously had applied only to lost opportunity claims — claims involving an increased risk of injury that did not rise to the level of proximate causation. These relaxed rules are inconsistent with the position that three of the justices of the new majority have taken previously on what evidence is required for a plaintiff to prove a traditional medical malpractice claim.[34] Such claims have always required “but for” causation. After today’s shift, therefore, all malpractice claims will be established using principles that could only have applied to lost opportunity claims. Few can miss how significant a departure this is from all of this Court’s medical malpractice jurisprudence that preceded this case.
1. THREE JUSTICES TODAY REPUDIATE THE TRADITIONAL CAUSATION PRINCIPLES THAT THEY REAFFIRMED JUST TWO YEARS AGO
The new majority appears to be of the view that the less said about its radical rewriting of this statute the *551 better. It is apparently not required to maintain a consistent position or explain a fundamental change in position when a judge is “doing” policy rather than interpreting the law. Certainly, such disclosures are probably not desired by jurists whose positions are undergoing radical “revision.” I commend the reader to compare the positions taken today by Chief Justice KELLY and Justices CAVANAGH and WEAVER with those taken just two years ago in Stone.[35] These three justices now repudiate the traditional proximate cause requirements that they previously recognized and applied at that time.
In Stone, Justice CAVANAGH, writing for himself and Justices KELLY and Weaver, held that a traditional medical malpractice action required “but for” causation. He specifically posed a hypothetical example in which a plaintiff’s opportunity to achieve a better result was reduced by 40 percentage points, from 80 percent to 40 percent. Thus, this hypothetical plaintiff’s risk of suffering a bad result increased from 20 percent to 60 percent as a result of the alleged medical malpractice. According to Justice CAVANAGH just two years ago, this hypothetical plaintiff “could not meet the more-probably-than-not standard of causation . . . ,”[36] Today these same three justices declare that a much smaller reduction in the opportunity to achieve a better result — from 90 to 95 percent to 80 to 90 percent — now satisfies the causation standard of a traditional malpractice case. This is not a product of the rule of law. This is a naked display of judicial whimsy and aggressive policy-making.
*552 2. JUSTICE HATHAWAY’S OPINION MISREADS CASELAW TO REDEFINE PROXIMATE CAUSE AND TO DO AWAY WITH THE TRADITIONAL REQUIREMENT THAT A PLAINTIFF PROVE A “BUT FOR” CAUSE UNDER THE MORE-PROBABLE-THAN-NOT STANDARD
Justice HATHAWAY’s opinion places much emphasis on the fact that our caselaw indicates that “a plaintiff need not prove that an act or omission was the sole catalyst for his injuries,”[37] in recognition that any given injury may have more than one proximate cause. It then uses this fact of logic and causation to create a false distinction that radically refashions proximate causation and negates the traditional requirement — as previously articulated even by Justice CAVANAGH — that proof of “but for” causation must “exclude other reasonable hypotheses with a fair amount of certainty.”[38]
The proposition that any injury may have more than one proximate cause is an unremarkable one for anyone who understands the principles of “but for” causation. An injury that involves a series of individual occurrences before it is manifested will have multiple “but for” causes. However, in such a case, each of these causes must be proved to have produced the injury under the more-probable-than-not standard, not merely proved to have increased the risk of injury, as this case does.
One of this Court’s cases on traditional causation, Brackins v Olympia, Inc, illustrates this point.[39] The plaintiff, a roller skating instructor, fell while roller skating at the defendant’s rink. He alleged that another skater had clipped his right skate and that, “as a result his skates became locked with his right foot and skate *553 behind his left skate.”[40] Furthermore, the plaintiff claimed that he could not have prevented the fall “because his left skate struck a ridge or inequality in the floor of the rink . . . ,”[41] The defendant rink owner sought summary disposition because it claimed that the proximate cause of the plaintiffs injury was the other skater clipping the plaintiffs skate, not the flaw in the rink surface. To be sure, the other skater’s action was a “but for” cause of the plaintiffs injury, as the injury would not have occurred without it. However, this Court concluded that the skating rink surface was also a proximate cause of the plaintiffs injury:
Defendant is not absolved from liability for its negligence because of the act of the other skater.... The proofs support the conclusion ... that plaintiff fell because of the roughness of, or the inequality in, the floor of the skating rink. Defendant’s negligence, if not the sole proximate cause of the accident, was, in any event, a proximate cause.[42]
Each of the “but for” causes in Brackins could be proved with near certainty. Accordingly, the Brackins Court concluded that both “but for” causes more probably than not directly caused the plaintiffs injury, and therefore it affirmed the jury’s award of damages to the plaintiff against the defendant. Nevertheless, in recognizing that an injury may have more than one “but for” cause, this Court has always, until now, required the traditional burden of proving that each particular “but for” cause more probably than not produced the injury.[43]
*554 The dual “but for” causes in Brackins are very different from the situation in the instant case. Here, all that plaintiff can show is that defendants’ alleged malpractice exacerbated plaintiffs preexisting sickle cell anemia to the extent of increasing his risk of suffering a stroke by between 5 and 10 percentage points. Plaintiff has simply not proved that the alleged malpractice caused his stroke, nor has he “exclude[d]” the “other reasonable hypothes[i]s” — his preexisting sickle cell anemia — “with a fair amount of certainty.”[44] Thus, plaintiffs preexisting sickle cell anemia could well have operated to injure him even in the absence of defendants’ alleged malpractice.
3. JUSTICE HATHAWAY’S AND JUSTICE CAVANAGH’S OPINIONS TAKE INAPPROPRIATE LIBERTIES WITH PLAINTIFF’S EXPERT STATISTICAL EVIDENCE BY FAILING TO COMPARE LIKE WITH LIKE
Even in applying their radical new approach to proximate causation, the justices in the new majority *555 only reach their desired result by manipulating the expert’s statistical evidence in ways inconsistent with the experts’ own use of the statistical evidence and, similarly, in ways inconsistent with the uncontroversial and essential principle of statistical methodology of comparing “like with like.” The new majority’s inappropriate use of the statistical evidence presented in this case provides further proof that it is engaging in result-driven jurisprudence. Only this motivation could support such a mathematically illiterate presentation.
Justice HATHAWAY’s opinion declares, under the guise of requiring “results [to] be viewed in the light most favorable to the nonmoving party,”[45] that any mishmash of figures that yields a result of greater than 50 percent will establish proximate causation between the alleged malpractice and the plaintiffs injury sufficient to defeat summary disposition. Thus, while Justice HATHAWAY’s opinion expressly declines to adopt any particular mathematical formula for determining whether proximate cause exists in a given case, it essentially adopts every formula that an attorney or judge can manufacture. This is not a serious analysis— “statistical” or otherwise. Justice HATHAWAY’s opinion is simply an invitation for the artful manipulation of probability figures and calls to mind the adage Mark Twain once attributed to Benjamin Disraeli, that there are “three kinds of lies: lies, damned lies, and statistics.”[46] '
Two of the formulas that Justice HATHAWAY’s opinion identifies by name bear closer analysis. Her opinion indicates that the evidence in this case can be “viewed *556 as a standard percentage increase calculation .. . .”[47] The flaw in using this “standard percentage increase calculation” in a traditional medical malpractice case is obvious. Such a calculation would turn the facts of Falcon — a case in which no justice believed that the plaintiff could prove “but for” causation using a more-probable-than-not standard[48] — into a traditional medical malpractice case.
In Falcon, the plaintiffs decedent, Nena Falcon, suffered an amniotic fluid embolism, “an unpreventable complication” of childbirth.[49] A woman who suffers this complication has a 62.5 percent probability of dying, even if it is treated immediately. Because of alleged malpractice, however, Nena Falcon’s amniotic fluid embolism was not treated immediately. This alleged malpractice increased her chance of death to 100 percent.[50] Under the “standard percentage increase calculation” used by Justice HATHAWAY to support her radical departure from requiring traditional proximate causation in this case, the defendant’s alleged malpractice in Falcon was responsible for increasing Nena Falcon’s chance of dying by 37.5 percentage points over the preexisting 62.5 percentage point chance of dying. This represents a 60 percent increase in her chance of dying (37.5/62.5), and satisfies Justice Hathaway’s conclusion that any *557 formula that reaches the magic number of more than 50 percent is satisfactory. Justice HATHAWAY’s opinion has, therefore, taken a judicially created aberration of proximate causation, Falcon, and applied it so that she can satisfy the proximate cause component of a traditional medical malpractice claim. Fortunately, Justice HATHAWAY’s opinion is the only opinion that adopts this approach, so this “standard percentage increase calculation” does not, therefore, have support from a majority of this Court.
However, a second approach used by Justice HATHAWAY that I wish to discuss does appear to have the support from a majority of this Court — what Justice HATHAWAY calls the “standard percentage decrease calculation.”[51] This approach takes the pre- and postmalpractice probabilities of suffering the injury and calculates what proportion of the postmalpractice probability of injury is attributable to the malpractice. The percentage approach is found nowhere in this Court’s proximate cause jurisprudence, yet both Justice HATHAWAY’s opinion and Justice CAVANAGH’s concurring opinion apply it to conclude that plaintiff has made the requisite showing of probable cause to defeat defendants’ motions for summary disposition.
As stated, three of the justices who support this approach do so in opposition to their previously stated positions.[52] Moreover, Justice HATHAWAY’s opinion and *558 Justice CAVANAGH’s concurring opinion apply the new standard in an especially troubling fashion. It is a *559 truism in statistical methodology that one marshaling statistical evidence to support causation must apply the principle of ceteris paribus by “comparing like with like.”[53] The new majority violates this basic principle of statistical analysis to reach its desired result. The expert testimony indicated that plaintiffs chance of suffering a stroke would have been reduced from the range of 10 to 20 percent to the range of 5 to 10 percent if plaintiff had been treated according to the asserted standard of care. In clarifying these statistical ranges, the expert concluded that plaintiffs likelihood of suffering a stroke would have been “cut in half” under the standard of care urged by plaintiff. In other words, the upper end of the range of plaintiffs likelihood of suffering a stroke was “cut in half,” from 20 percent to 10 percent, and the lower end of that range was also “cut in half,” from 10 percent to 5 percent. Rather than comparing like with like — the lower end of each range or the upper end of each range — a majority of this Court fallaciously compares the lower end of one range (5 percent) with the upper end of the other (20 percent). They do so in order to conclude that the alleged malpractice caused 75 percent of plaintiffs chance of suffering a stroke (15/2o).[54] This failure to “compare like with like” is a patent error of statistical analysis, but it *560 gets the majority where it needs to go to support its conclusion that plaintiff has established “but for” cause.
Finally, Justice HATHAWAY’s opinion concludes that “plaintiff established a question of fact on the issue of proximate causation because plaintiff’s experts opined that defendants’ negligence more probably than not was the proximate cause of plaintiff’s injuries.”[55] This statement might have had more relevance if it had been supported by the experts’ actual statistical evidence of plaintiffs chances of suffering the stroke. However, as discussed above, plaintiffs experts were unable to show proximate causation between the alleged malpractice and plaintiffs stroke. All they were able to show was a connection between the alleged malpractice and plaintiffs increased likelihood of suffering a stroke, from between 5 to 10 percent to between 10 to 20 percent. Justice HATHAWAY’s analysis, such as it is, allows an expert to say certain “magic words” about proximate causation, while presenting statistical evidence to the contrary.
As stated, this case is a prototypical lost opportunity case because plaintiff cannot establish that, more probably than not, defendants proximately caused his stroke because he was predisposed to suffer one, his risk being in the range of 5 to 10 percent, even with medical care that satisfied plaintiffs proposed standard of care. Accordingly, I vigorously dissent from the conclusion of a majority of this Court that plaintiff asserted a traditional medical malpractice claim and would instead conclude that plaintiff asserted a lost opportunity claim.
C. MCL 600.2912a(2) IS (STILL) UNENFORCEABLE AS ENACTED
Because the new majority concludes that plaintiffs claim is a traditional medical malpractice claim, it does *561 not need to reach the question whether plaintiffs claim meets the requirements of the second sentence of MCL 600.2912a(2), which applies only to lost opportunity claims. The decision of the new majority to treat this case as a traditional medical malpractice claim, of course, obviates the need for interpreting the second sentence of MCL 600.2912a(2) because the new majority essentially treats all medical malpractice claims under the weakened Falcon causation standard heretofore applicable only to lost opportunity claims. Therefore, the decision of the new majority to overrule the Court of Appeals’ decision in Fulton, to the extent Fulton drew a line between lost opportunity cases and traditional medical malpractice cases, also does away with Fulton’s application of the sentence in § 2912a(2) that applies to lost opportunity cases. Fulton only applies to lost opportunity cases. By concluding that the instant case sounds in traditional medical malpractice, the new majority essentially writes the decision in Fulton out of existence. Thus, its expansive decision in this case is characteristic of the new majority that overreaches in its decisions in order to achieve its own preferred policy outcomes.[56]
*562 The Legislature added subsection (2) to MCL 600.2912a shortly after the Falcon Court created the *563 new claim for loss of an opportunity to survive. The new subsection provides:
In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.[57]
As the lead opinion in Stone aptly observed, there are multiple problems in determining whether the requirements of MCL 600.2912a(2) apply in any particular case. As stated above, the two sentences are internally inconsistent and, therefore, create a paradox:
[T]he first sentence of this new subsection codifies and reiterates the common-law requirement that a plaintiff show that the defendant’s malpractice more probably than not caused the plaintiff’s injury. The second sentence of subsection 2 adds that, in medical-malpractice cases, a “plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%. ” However, one must keep in mind that the relevant caselaw when subsection 2 was enacted held that the lost-opportunity doctrine applies “in situations where a plaintiff cannot prove that a defendant’s actions were the cause of his injuries . . . .” Vitale, [150 Mich App] at 502 (emphasis added). That is, the first sentence of subsection 2 requires plaintiffs in every medical-malpractice case to show the defendant’s malpractice proximately caused the injury while, at the same time, the second sentence refers to cases in which such proof not only is unnecessary, but is impossible.[58]
*564 Even ignoring the internal inconsistency, the second sentence of subsection (2) is incomprehensible as written. Subsequent to the amendment, the split Court of Appeals panel in Fulton offered two contradictory interpretations of the second sentence, neither of which was consistent with the text of that sentence as enacted. The Fulton majority determined that “MCL 600.2912a(2) requires a plaintiff to show that the loss of the opportunity to survive or achieve a better result exceeds fifty percent.”[59] As the lead opinion in Stone indicated, this interpretation “improperly adds to the statute the words ‘loss of,’ effectively replacing the word ‘opportunity’ where it is used the second time with the phrase ‘loss of opportunity.’ ”[60] Thus, the Fulton majority essentially rewrote the second sentence of § 2912a(2) to include the following bracketed words: “In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the [loss of] opportunity was greater than 50%. ”
The dissenting judge in Fulton did not fare any better. His interpretation of MCL 600.2912a(2) required a plaintiff “ ‘to show that, had the defendant not been negligent, there was a greater than fifty percent chance of survival or a better result.’ ”[61] This interpretation essentially rewrote the second sentence of § 2912a(2) to include the following bracketed word: “In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or *565 an opportunity to achieve a better result unless the [initial] opportunity was greater than 50%.”
Thus, both the majority and the dissent in Fulton inserted additional words into the statute. Their reasons for doing so were identical: each believed the additional language was necessary to enforce the perceived legislative intent to respond to the Falcon Court’s creation of the lost opportunity claim. However, these multiple interpretations show that, even if they were correct that the amendment was a legislative response to Falcon, the scope of such response was far from clear.
In the end, the lead opinion in Stone concluded:
It is confounding to attempt to ascertain just what the Legislature was trying to do with this amendment. ...
As written, the second sentence of MCL 600.2912a(2) can be made understandable only by adding words or by redefining “injury” in a way significantly contrary to the mass of caselaw at the time the sentence was added.... None of these multiple, contradictory interpretations can be shown to be the “correct” construction of legislative intent. Choosing between them can only he a guess... . Accordingly, I conclude that the second sentence of subsection 2 cannot be judicially enforced because doing so requires the Court to impose its own prerogative on an act of the Legislature.[62]
Since this Court’s split opinions in Stone, the Legislature has not clarified the confusion surrounding the appropriate interpretation of MCL 600.2912a(2). Therefore, my position remains that the provision is unenforceable as enacted.
The decision by the new majority that this case represents a traditional medical malpractice case further muddles this important area of the law. Moreover, *566 three justices of the new majority have changed their published positions over the past several years on the nature of the evidence required to prove proximate cause.
If the numerous fractured decisions and inconsistent opinions of the members of this Court fail to demonstrate that this statute is impossible to interpret reasonably, then it is hard to envision a better illustration that MCL 600.2912a(2) is inherently internally inconsistent and cannot be parsed.
IV CONCLUSION
Confusion and uncertainty in the law prevent citizens from arranging their affairs in a predictable fashion. This Court initially created uncertainty in adopting the lost opportunity claim in Falcon because it was so profoundly at odds with traditional principles of causation. It is no wonder that the Legislature had difficulty reconciling “Falcon causation” with the traditional causation that the Legislature clearly desired to maintain in medical malpractice claims. Today, the new majority has created even more uncertainty in interpreting the legislative response to Falcon. While the result in this case undoubtedly serves the interests of lawyers who litigate medical malpractice cases, it poorly serves the people of this state to have the law become even more incomprehensibly muddled. This is not an accidental act, but one intentionally designed to thwart the legislative directive that the plaintiff prove the traditional requirement of proximate cause in every “action alleging medical malpractice . . . .”[63] Judges, as neutral arbiters whose function is merely to interpret the laws *567 enacted through the democratic process, should not be agents of “societal change” they desire, and they certainly should not contribute to confusion and chaos in the law. The new majority’s resolution of this case fails on both counts.
Plaintiffs claim is a prototypical lost opportunity claim. As such, the second sentence of MCL 600.2912a(2) expressly controls plaintiffs claim. However, I continue to maintain that § 2912a(2) is unenforceable as enacted, and I reiterate former Chief Justice TAYLOR’S call for the Legislature “to reexamine its goal and the policies it wishes to promote and strive to better articulate its intent in that regard.”[64] Today, that call is more urgent than it was just two years ago.
Today is a sad day for predictability in Michigan law. The disorder sown by the new majority in their several opinions speaks poorly of the quality of decision-making in this Court. Doctrinal destruction aside, the obvious manipulation of the statistical evidence by the justices of the new majority to achieve their goal of creating a cause of action when the proofs have failed is itself worthy of condemnation.
For all of the reasons stated, I vigorously dissent from overreaching by the new majority and, instead, would vacate as improvidently entered this Court’s September 30, 2009, order granting leave to appeal.
Corrigan, J., concurred with Young, J.

1 She Said, Detroit Free Press, December 10, 2008, p 2A. Chief Justice Kelly objects that I “continue!] to quote and misleadingly characterize a *533 statement [she] made nearly two years ago off the bench.” Ante at 513. As my dissenting opinion in Univ of Mich Regents v Titan Ins Co, 487 Mich 289, 322-325, 327-330; 791 NW2d 897 (2010) (Young, J., dissenting), explains at length, my characterization of her statement is not misleading. Chief Justice Kelly’s remarks both set an agenda for undoing the precedents of the previous 10 years and are especially mean-spirited in light of the political attacks against former Chief Justice Taylor during the 2008 campaign.

 See, e.g., Smith v Dep’t of Pub Health, 428 Mich 540; 410 NW2d 749 (1987), for a model case in the same chaotic vein as today’s split decisions. It exemplifies the era to which this Court returns in this case.

 1977 PA 272.

 Falcon v Mem Hosp, 436 Mich 443; 462 NW2d 44 (1990).

 See MCL 600.2912a, as amended by 1993 PA 78.

 MCL 600.2912a(2).

 Skinner v Square D Co, 445 Mich 153, 166; 516 NW2d 475 (1994) (citation omitted).

 See Falcon, 436 Mich at 471 (opinion by Levin, J.) (“In this case, 37.5 percent times the damages recoverable for wrongful death would he an appropriate measure of damages.”).

 See n 52 of this opinion for further elaboration on the significance of Justice Cavanagh’s repudiation of the position he took just two years ago in Stone v Williamson, 482 Mich 144, 175-177; 753 NW2d 106 (2008) (opinion by Cavanagh, J.).

 Berg, Hathaway attacks, Michigan Lawyers Weekly, October 27, 2008 (“ ‘People need to know what the law is,’ Hathaway said. T believe in stare decisis. Something must be drastically wrong for the court to overrule.’ ”); Lawyers’ election guide: Judge Diane Marie Hathaway, Michigan Lawyers Weekly, October 30, 2006 (quoting Justice Hathaway, then running for a position on the Court of Appeals, as saying that “[t]oo many appellate decisions are being decided by judicial activists who are overturning precedent”).

 See, e.g., Univ of Mich Regents, 487 Mich at 314-317 (Hathaway, J., concurring).

 Ante at 506 n 22.

 Wickens v Oakwood Healthcare Sys, 465 Mich 53; 631 NW2d 686 (2001).

 See the text accompanying n 1 of this opinion.

 Ante at 506 n 22.

 One could read this dicta in Justice Hathaway’s opinion as a signal that the new majority will overrule Wickens. However, the majority has already so signaled in its order granting leave to appeal in Edry v Adelman, 485 Mich 901 (2009). Edry was decided on narrow evidentiary grounds, Edry v Adelman, 486 Mich 634; 736 NW2d 567 (2010), but, as Justice Hathaway’s decision in this case exemplifies, its decision was decidedly not a reaffirmation of the continued vitality of Wickens.

 Fulton v William Beaumont Hosp, 253 Mich App 70; 655 NW2d 569 (2002).

 Stone, 482 Mich at 144 (opinion by Taylor, C.J.).

 Beers & Berkow, eds, The Merck Manual of Diagnosis and Therapy (17th ed) (Whitehouse Station, NJ: Merck & Co, Inc, 1999), pp 877-878.

 Id. at 879.

 MCL 600.2912a(2) provides, in pertinent part: “In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%. ”

 Fulton, 253 Mich App at 83-84.

 O’Neal v St John Hosp & Med Ctr, 477 Mich 1087 (2007).

 O’Neal v St John Hosp & Med Ctr, unpublished opinion per curiam of the Court of Appeals, issued November 4, 2008 (Docket Nos. 277317 and 277318).

 Id. at 2 (Jansen, J., concurring).

26 O’Neal v St John Hosp & Med Ctr, 485 Mich 901 (2009).

27 Stone, 482 Mich at 152-157 (opinion by Taylor, C.J.).

 Id. at 157.

 Weymers v Khera, 454 Mich 639, 647; 563 NW2d 647 (1997), citing Skinner, 445 Mich at 162-163.

30 Craig v Oakwood Hosp, 471 Mich 67, 87; 684 NW2d 296 (2004), quoting Skinner, 445 Mich at 174.

 Skinner, 445 Mich at 166 (Cavanagh, C.J.) (citation omitted).

 Id. (emphasis added).

 See Falcon, 436 Mich at 450 (opinion by Levin, J.) (characterizing the traditional approach to “but for” causation as “measured as more than fifty percent” and concluding that a 37.5 percentage point reduction in the opportunity for surviving could not prove “but for” causation). Thus *550 no one, not even those in the Falcon decision who created an exception, has ever required less than a “more than 50 percentage point” change in order to establish a traditional medical malpractice claim. Just two years ago, Justices Cavanagh, Weaver, and Kelly reaffirmed, this position. See Stone, 482 Mich at 175-177 (opinion by Cavanagh, J.).

 Sfee id.

 See id. Justice Cavanagh at least has the forthrightness to indicate that he today repudiates this position. Ante at 511 n 7.

 Stone, 482 Mich at 177 (opinion by CAVANAGH, J.).

 Craig, 471 Mich at 87.

 Skinner, 445 Mich at 166 (emphasis added; quotation marks and citation omitted).

 Brackins v Olympia, Inc, 316 Mich 275; 25 NW2d 197 (1946).

 Id. at 277.

 Id.

42 Id. at 283 (emphasis added).

 Justice Hathaway claims that this position “would allow recourse for the negligent actions of medical providers only in those instances in which one provider’s conduct is at issue and only when no pre-existing medical *554 condition exists.” Ante at 497 n 12. This is patently false. First, as stated, there can he multiple “but for” causes for a particular injury, including the negligent conduct of multiple medical providers. All of these hypothetical negligent acts, however, must themselves be “but for” causes, like the chain reaction of events that caused the roller skating injury in Brackins. Second, a medical provider’s negligence may, more probably than not, he a “but for” cause of an injury even when the plaintiff has a preexisting condition. This was the very situation that this Court encountered in Stone. The plaintiff in Stone alleged that a timely diagnosis of an aortic aneurysm would have given him a 95 percent chance of attaining a good result. Instead, his aneurysm ruptured, requiring emergency surgery and ultimately amputation of his legs. According to the plaintiff’s experts, “misdiagnosed patients whose aneurysms rupture have only a 10 percent chance to achieve a good result.” Stone, 482 Mich at 148 (opinion by Taylor, C.J.). Thus, even though the plaintiff had a preexisting medical condition, the defendants’ misconduct increased the plaintiffs probability of suffering a bad result from 5 percent to 90 percent. This increase of 85 percentage points provided a sufficient factual basis to defeat the defendants’ motions for judgment notwithstanding the verdict.

 Skinner, 445 Mich at 166 (quotation marks and citation omitted).

 Ante at 505 n 20.

 Twain, My Autobiography: "Chapters” from the North American Review (Mineóla, NY: Dover Publications, Inc, 1999), p 208.

 Ante at 504-505.

 Falcon, 436 Mich at 460 (opinion by Levin, J.) (“[I]t cannot be said, more probably than not, that [defendant] caused [plaintiffs] death.”); id. at 472-473 (Boyle, J., concurring) (“I concur in the recognition of Tost opportunity to survive’ as injury for which tort law should allow recovery in proportion to the extent of the lost chance of survival... provided that the negligence of the defendant more probably than not caused the loss of opportunity.”); id. at 473 (RILEY, C.J., dissenting) (“[I]t is uncontested that the plaintiff cannot show that defendant’s negligence caused the decedent’s death . . ..”).

 Falcon, 436 Mich at 454 (opinion by LEVIN, J.).

 Id. at 454 n 16.

 Ante at 504.

 Under the hypothetical example Justice CAVANAGH posed in Stone, a plaintiff whose risk of suffering a bad result increases from 20 percent to 60 percent is unable to prove causation under the more-probable-than-not standard. This is because the plaintiffs risk has not increased by the more than 50 percentage points traditionally required to prove “but for” causation. Justice Cavanagh applies a very different approach today, and, under that approach, his hypothetical Stone plaintiff would be able to prove causation. Whatever innocence Justice Cavanagh now feigns *558 in treating both that hypothetical case and the instant case as traditional medical malpractice cases, he is unequivocally converting what used to be a lost opportunity case into a traditional medical malpractice case.
A plaintiff who has a preexisting medical condition is only able to prove “but for” causation when the alleged malpractice increases the plaintiffs risk of suffering a “bad result” by more than 50 percentage points. Otherwise, there is no way to exclude, as Justice Cavanagh (and this Court) has previously required, all “other reasonable hypotheses with a fair amount of certainty.” Skinner, 445 Mich at 166 (quotation marks and citation omitted). The approach adopted by the opinions of Justices Hathaway and Cavanagh negates this basic requirement of proximate cause and would allow a plaintiff to recover for a bad result even in situations in which other, nonmalpractice “causes” for the result predominated in creating it.
The new majority’s approach would allow a plaintiff to recover in full from a doctor who, for example, failed to diagnose cancer at its earliest stages, but still diagnosed it at a stage where it was much more probable than not that a patient would survive. To put figures on this situation, suppose a plaintiffs risk of dying from cancer is 1 percent if it is caught at its earliest stages. A doctor who fails to catch the cancer at that stage, but who catches it and treats it at a stage where the risk of dying from cancer is 3 percent, then, is liable, under the new majority’s new approach, for the entire injury, should one occur, because the failure to diagnose contributed to 2h of the risk of injury. This is true, according to the new majority, even though the doctor only decreased the patient’s chance of surviving by 2 percentage points, from 99 percent to 97 percent.
By shifting many lost opportunity claims into traditional medical malpractice claims, the new majority creates additional liability of a defendant for the entire injury, not just for the increased risk of injury, as lost opportunity claims provide. See Falcon, 436 Mich at 471 (opinion by Levin, J.) (“In this case, 37.5 percent times the damages recoverable for wrongful death would be an appropriate measure of damages.”). This shift in determining a defendant’s liability is essential to understanding what the new majority is trying to accomplish in this case. Now plaintiffs need only prove that a doctor’s negligence contributed to the risk of injury, not that his negligence actually caused the injury. And no amount of pretended ignorance about the significance of these changes by members of the new majority alters their fundamental and radical impact on this area of the law.

 See Lewis-Beck, Bryman, & Liao, eds, 1 The SAGE Encyclopedia of Social Science Research Methods (Thousand Oaks, Cal: SAGE Publications, Inc, 2004), p 117 (“Ceteris paribus ... refers to the process of comparing like with like when asserting a causal relationship or the effect of one variable on another.”).

 The new majority calculates that defendants’ alleged malpractice caused an increase in plaintiffs risk of suffering a stroke by 15 percentage points (5 percent risk without malpractice subtracted from 20 percent risk with malpractice). They then divide that figure by plaintiffs 20 percent risk of a stroke with malpractice to conclude that the alleged malpractice caused 75 percent of plaintiffs chance of suffering a stroke. See ante at 504, 512.

 Ante at 490.

 Although the “new majority” has only been in existence 18 months, it has an impressive record of overturning cases consistent with the Chief Justice’s promise to “undo ... the damage that the Republican-dominated court has done.” She Said, Detroit Free Press, December 10, 2008, p 2A.
By my count, the new majority has now overturned this term 12 cases in addition to the one that it overturns today.
1. In People v Feezel, 486 Mich 184; 783 NW2d 67 (2010), the new majority overruled People v Derror, 475 Mich 316; 715 NW2d 822 (2006).
2. In McCormick v Carrier, 487 Mich 180; 795 NW2d 517 (2010), the new majority overruled Kreiner v Fischer, 471 Mich 109; 683 NW2d 611 (2004).
In Lansing Sch Ed Ass’n v Lansing Bd of Ed, 487 Mich 349; 792 NW2d 686 (2010), the new majority overruled the following cases:
*562 3. Lee v Macomb Co Bd of Comm’rs, 464 Mich 726; 629 NW2d 900 (2001);
4. Crawford v Dep’t of Civil Serv, 466 Mich 250; 645 NW2d 6 (2002);
5. Nat’l Wildlife Federation v Cleveland Cliffs Iron Co, 471 Mich 608; 684 NW2d 800 (2004);
6. Associated Builders & Contractors v Dep’t of Consumer & Indus Servs Dir, 472 Mich 117, 124-127; 693 NW2d 374 (2005);
7. Mich Chiropractic Council v Comm’r of the Office of Fin & Ins Servs, 475 Mich 363; 716 NW2d 561 (2006);
8. Rohde v Ann Arbor Pub Sch, 479 Mich 336; 737 NW2d 158 (2007);
9. Mich Citizens for Water Conservation v Nestlé Waters North America Inc, 479 Mich 280, 302-303; 737 NW2d 447 (2007); and
10. Manuel v Gill, 481 Mich 637; 753 NW2d 48 (2008).
11. In Bezeau v Palace Sports & Entertainment, Inc, 487 Mich 455; 795 NW2d 797 (2010), the new majority expressly overruled the limited retroactive effect of Karaczewski v Farbman Stein & Co, 478 Mich 28; 732 NW2d 56 (2007).
12. In Univ of Mich Regents v Titan Ins Co, 487 Mich 289; 791 NW2d 897 (2010), the new majority overruled Cameron v Auto Club Ins Ass’n, 476 Mich 55; 718 NW2d 784 (2006).
Given this list of “lately departed” decisions of the “Republican-dominated Court,” killing one Court of Appeals case such as Fulton— even if entirely irrelevant to the question the new majority purports to address here — is hardly surprising for the new majority which, before its members became the majority, were individually and collectively notably more “hawkish” on preserving precedent. See Pollard v Suburban Mobility Auth for Regional Transp, 486 Mich 963, 963-965 (2010) (Young, J., dissenting statement). As in three other cases decided this term, Justice Weaver repeats her tired and unsuccessful attempt to defend her changing position on stare decisis. Ante at 513-515. See also Univ of Mich Regents, 487 Mich at 310-314 (Weaver, J., concurring); Lansing Sch Ed Ass’n, 487 Mich at 381-384 (Weaver, J., concurring); McCormick, 487 Mich at 223-226 (Weaver, J., concurring). Her position does not become any more convincing with repetition. My dissenting opinion in Univ of Mich Regents, 487 Mich at 325-327 & n 11 (Young, J., dissenting), explains in full why Justice Weaver’s position is merely an attempt to justify stark judicial policy-making.

57 MCL 600.2912a(2).

58 Stone, 482 Mich at 156-157 (opinion by Taylor, C.J.).

 Fulton, 253 Mich App at 83.

 Stone, 482 Mich at 159 n 9 (opinion by TAYLOR, C.J.).

 Fulton, 253 Mich App at 91 (Smolenski, J., dissenting), quoting Wickens v Oakwood Healthcare Sys, 242 Mich App 385, 392; 619 NW2d 7 (2000). The published Court of Appeals decision in Wickens was not controlling in Fulton because this Court had already reversed in part and vacated in part that published decision. Wickens, 465 Mich at 62.

62 Stone, 482 Mich at 160-161 (opinion by Taylor, C.J.).

 MCL 600.2912a(2).

 Stone, 482 Mich at 165 (opinion by Taylor, C.J.).